justice in this or in this case he's not available today for the oral argument but he will fully participate in these proceedings and of course the audio tape is available and the audio on the Supreme Court website for oral arguments would be available for his review and I think that's all I need to mention at this point. I would ask both attorneys that will be presenting oral argument step up and identify yourselves for the record. Good morning Your Honors Ruth Major on behalf of the appellant Harriet Walczak. Good morning to both of you. Each side will have approximately 15 minutes to present oral argument and from that you may proceed. First we do appreciate having the chance to present this case with an oral argument to Your Honors. We consider this to be a very important case for several reasons. One, obviously it's important for my client because she lost her job and as the case law indicates losing your job is the death penalty in employment cases. It's the most serious result that you can have in your employment. We also consider this to be a very important case because what the court decides today could have a large impact on a lot of other teachers in the state of Illinois. The cases that we're going to be addressing today and the issues that we're going to be addressing today in large part depend on how this court interprets the statute. The Illinois school code and the sections that relate to the hearings relating to teacher terminations. By way of background and I'm sure the court is aware of this, Ms. Walczak was a teacher for the Chicago Public Schools for over 30 years. In those 30 years she taught for different schools under different administrators and never once had a performance review that was below satisfactory. Not once. She's been licensed to teach 6 through 12. Was there some suggestion in the record that she had an unsatisfactory rating? Wasn't that what brought this whole thing to the forefront? I guess I'll get to that. Prior to the time. Prior to 2006-2007. And you are correct that in that time period things did change. So Ms. Walczak never had a bad performance review until she started reporting to a new principal, Principal Japson. Now what we're in front of this court today about is not to ask this court to weigh the evidence and to decide who's telling the truth and whether Ms. Walczak was or was not a good teacher. What we're here to address with the court is who rightfully should make that determination. Well, who rightfully should make that determination or was there a procedural mistake in terms of once the board, well, they decided to terminate her. And I think that the question isn't whether they have the right to do that. I don't think that there's any question about that. But you're suggesting that. Well, let me elaborate. Yes. I thought the question was more did the board deny her due process by essentially not accepting the factual findings or credibility determinations in their decision to then terminate her? You're correct, Your Honor. The ultimate decision, there's no dispute as to who holds the authority to make the ultimate decision. What we are here today to discuss is how that process works and what that ultimate decision maker needs to do in order to be in compliance with the Illinois school code. As this court knows, it's well settled in Illinois that administrative bodies get their authority from state staff. Yes. The board is arguing that although the hearing officer made certain findings and made a recommendation not to terminate Ms. Walczak, they are free to ignore his findings and opinions because he relied in part on the testimony of Witness Blumenthal, who in their opinion was not an expert. This is a case where the hearing officer made certain findings and made a recommendation not to terminate Ms. Walczak. And because they can discount Blumenthal's testimony, they can make their own findings without even conferring with the hearing officer. And therefore, they're not in violation of HERN. Well, let me go through a few different reasons why we think that's wrong. First of all, it's our position that under the statute, only the hearing officer can make findings of fact. Now, in the HERN decision, in the introduction, there was a reference that referred to the findings of fact by the hearing officer as being recommendations. There was no analysis of that issue. And if you look at the statute, the statute very clearly does not refer to the hearing officer's findings of facts as being recommendations. It refers to them as being findings of facts, and the language in the statute is that the decision that the hearing officer provides to the board is a recommendation. So there's two aspects to the process that goes on here. One is the findings of fact, and the statute said that that responsibility belongs to the hearing officer. Now, when we look at statutes, we have to use the well-recognized principles of statutory interpretation. One of those principles is that you cannot review the statute to have any words that would be superfluous. Well, let's go into that a little bit, what you just said. Sure. Now, according to the statute, the findings of fact of the hearing officer, well, let's say there may be, they don't quite say prima facie true and correct, but they are determinative, or what was the word you used? Well, some statutes say that a higher level administrative agency has to accept the findings of fact unless they're against the manifest weight of the evidence. This statute doesn't say that. It doesn't provide any basis for the board to reject the findings of fact. Well, by not saying they have to accept them, isn't there some sort of ability to consider them? And let's say that there's some facts that would support the board's determination for discharge based upon the entire record and what was compiled by the hearing officer. If there's some evidence to support their conclusion to discharge based upon the entire record of the 240 pages, are they able to do that? Well, if there were findings of fact, if they had properly followed the statute, which they did not do, which means recognize and accept the findings of fact of the hearing officer, that's the first step. The statute only allows the board to do it. If they had done that, and they said, okay, we accept all these findings of fact, but we believe that some of those findings support a different decision than you've recommended, they would be within the statute. They would be in compliance with the statute. That's not what they did. Could it be argued that that's what they did? I mean, their report isn't as flimsy, if that's the right word, as the one that was in HERN. There's multiple pages. They talk about, you know, the findings. Well, they question some of the findings. They question whether they really were findings. They suggest they were more conclusory. But let's talk about, if you could pinpoint, where would you say that the hearing officer, Jordan, did he make credibility determinations as far as Jackson, the principal? Would you say he did? He absolutely did. And would you say that he made credibility determinations about the expert Blumenthal? What was the woman? Ellen Kelly, or the expert witness Blumenthal. Blumenthal. He did, but here's the thing. What about Kelly? And he did as well. He made credibility determinations about all of us. Yes. And he found Jackson to have a bias, to not be credible, and to be incompetent. Yes. And he also found Kelly, while merely and barely paper qualified, to not have conducted the remediation in a way that he would consider to be in good faith. Yes. And the two of them, and those were the two that were overseeing and handling this remediation, both, in his opinion, based on the facts, hearing the testimony, seeing the witnesses, weighing the evidence, in his opinion, the environment was absolutely not factually supportive. What's his opinion? Of the remediation. I'm sorry. I'm sorry. I didn't mean to interrupt. What's his opinion of Kelly based on Blumenthal's testimony, or did he have that independent? He had many, many statements about Kelly and his opinion of her. He identified that she made statements that Ms. Walchick hadn't done certain things, like given homework assignments, even though she admitted she wasn't in the class the entire time, including in the morning, when Ms. Walchick accepted it. He made findings that her conduct, based on the testimony of both Kelly herself and Ms. Walchick, was intrusive and disruptive. Was there another witness named Lisa Walchick? Yes. Oddly enough, yes, but no relation. No relation. To the hearing. And then he also, did he also, he heard from Ms. Walchick. He did hear from Ms. Walchick. And did he find her to be credible? I believe he did, yes. Yes. All right. He found her. So, you know, the whole, I mean, his finding was that this principal, in every respect, did not do what she needed to do in order to make this a meaningful remediation as required under the statute. That was, those were factual determinations that the principal, the principal walked in the classroom and said, does anybody want to tell me any, you know, comments they have or criticisms they have of Ms. Walchick? In the middle of the teaching period. And then when one of the teachers said... Well, is that when one of the students said she's old? Exactly. And then the, Jackson asked, does anybody else think she's old? Yes. That's an example. That's the kind of testimony that the hearing officer heard. And the hearing officer concluded that Jackson and Kelly were not credible witnesses, that they did not do a good job, even if you believe the things that they said, and that Ms. Walchick did not have the type of remediation, the facts were not there, and that the environment, which is a factual determination, was not supportive of a remediation process. Well, what is, what is your, is your request for relief that the matter be remanded for the board to permit participation by the hearing officer, George? Not, not, not, not now, Your Honor. Why not? Because there's too many, the board here has demonstrated that, that they are not going to follow this statute. I mean, even if you look at Hearn, okay, my argument before the court is that, that they don't even have the role of fact finder here, okay? Hearn addressed the issue from a different perspective. Hearn addressed the issue of, let's assume. But, you know, if we take your argument to the extreme, then that would seem to take away the final decision, the determination whether to fire or not to, from the board. No, it wouldn't, Your Honor, because. I think it would, but you tell me why, tell me why. There can be many situations where, and many, many administrative agencies operate this way. I mean, every variation exists out there. Yes. The boards can take the findings of fact and say, we agree, we're taking your findings of fact, but we disagree that that doesn't support determination. And there may be cases of it, okay? Maybe there are cases where there's even undisputed facts, or maybe there's cases where, you know, the hearing officer says, I do believe that Ms. Walchek didn't submit reports, and I do submit that Ms. Walchek wasn't trying to cooperate with the program, but I think she did enough and she should be held on. The board can say, well, we appreciate that's your opinion, but we think that evidence supports determination. And that is how this process is to work. And there's another thing. If you look at. But you're requesting that we simply not, well, we're not really looking at the circuit court's decision. Are you requesting that we reverse the board's decision and order her to be reinstated with back pay because this board will not adequately or properly confer with the fact finder in reaching a determination? That's part of the reason, Your Honor, yes. And that's what happened in the other decisions, you know, that have been addressed in these briefings. That's what happened in the Ruther case. They didn't send it back for re-hearings. That's what happened in her. In both of these cases, the decision upholding the reinstatement was affirmed. And there weren't further directives to go back and do it the right way or do it again. That was the holding of the court. So that's what we're asking for. And if you look at the statute, 534.856, findings of facts, the hearing officer, and then the recommendation as to whether or not the teacher or principal should be dismissed, that's a recommendation. Findings of facts, recommendation does not appear in connection with that word. Only the decision. And then 534.857, the board shall make a decision as to whether the teacher or principal. No statement about findings of fact as to the board. 534.855, another provision that says the hearing officer shall give weight to all of the teacher's evaluations. That's just another provision in there talking about who the fact finder is. No comment about the board giving weight to anything. The statute very clearly does not give the board. And so they never had that right, and they needed to accept those findings of fact. Secondly, they didn't follow Hearn. And just like Hearn, the appellate court didn't send it back and say, okay, do it now. They did not follow the Hearn decision, which is very clear. It's a very clear decision. And then if you look at their decision, there are many, many findings of facts. And the findings of fact, contrary to when the board says it's hard to find, they couldn't find it, it's got a heading, findings of fact. It's very clearly demarcated in the opinion. And many of those findings of fact were either rejected out of hand, ridiculed, or completely disregarded by the board. And for those reasons, the board has not demonstrated, or has demonstrated, that their decision was arbitrary, was without cause, and was in clear abuse of the discretion that they had. They had no discretion to do those things. And Blumenthal is a red herring, okay? There is sufficient evidence in this record that the testimony of these witnesses that he did not believe them. Kelly, Jackson, the security officer, he didn't find them credible. This school was a school completely out of control, and that started at the top up. And immediately after that, Jackson was demoted to be an assistant principal. She couldn't handle it. And Ms. Walchuk never had the chance for remediation, if she ever even needed it to begin with, that she should have been afforded under the statute. All right. Ms. Mature, we will permit you some time in rebuttal. Thank you. Lauer. Your Honor, counsel, let's do look at Hearn. Let's start by looking at Hearn. And it says, We are not saying that due process requires the commission or board to defer to the findings of a hearing officer. That's what Hearn says. What statute were they interpreting at that time? The statute 3485, but actually the version that my opponent is citing wasn't adopted until 2011. But the statute at the time did say that the hearing officer made findings of fact and a recommendation. What page are you reading from? Of the opinion? Yes, where you said? 484 in the official version. No, I have it. I have it with me. I'm sorry. I was looking. You kind of have to read that in context. Then they say, We are not saying that the hearing officer should participate in the decision-making process of the board in every case or that the board should confer with the hearing officer in every case. Where the board rejects the recommendation. However, where credibility is the determining factor. Okay. And the reason I want to talk about credibility here is because in Hearn, the hearing officer specifically found that the plaintiff teacher and his three witnesses were credible. Here, the hearing officer didn't make an express finding that Ms. Wolchek was credible. In fact, on two main points, he found that she wasn't credible and that Principal Jackson was credible. Would you agree with Ms. Major, though, that the hearing officer found Ms. Jackson not credible, to use the correct word, I think, Kelly not credible, and Blumenthal not credible, and also Harriet Wolchek not credible? Or credible, rather. He didn't find her credible. And on two main points, he found Jackson more credible, and that was Ms. Wolchek testified that Principal Jackson said, You're old. I don't want you here. The board doesn't want old teachers. And also that remark about when Jackson came into the room and someone said Ms. Wolchek is old, and supposedly Ms. Jackson said, Does anyone else think she's old? Well, if the hearing officer had believed that, Your Honor, then he would have found that there was a basis that she was biased. And he found specifically that she wasn't. There was no evidence in the record to show she was biased on the basis of age or race. What did he conclude, then, that was her bias? Because he did say there was one, didn't he? Yeah. He said it could have been because she was a bad teacher. Is that a bias that we should hold against her? She's the principal evaluating teachers. If the teacher's bad, she shouldn't have a bias against them. 7% of these kids at Wells were reading at grade level, 7%. That's deplorable. They had to do something to turn that school around. Was that to get rid of the older teachers? No, and that's not what the hearing officer found. Well, he found that there was some political pressure on the board here to make changes. This school, was it Hispanic? It's in the Bucktown area. And they wanted to replace the principal. The alderman wanted to replace the principal. And the principal knew that, and she was under pressure to do what she thought the powers-that-be wanted to do. She asked for only four teachers to be remediated. Three of those were white. One was African-American. She's African-American. The hearing officer himself found that there was no evidence that this decision was based on age or race. So he's finding that Wolchek is credible. That feeds into the argument that they have. We have a teacher who, for 30 years, had never gotten an unsatisfactory rating. And then we get a new principal who's under political pressure. Then suddenly she gets an unsatisfactory. And interestingly, that principal had been in the school the year before, too. And she'd been in Wolchek's classroom ten times. And Ms. Wolchek supposedly is saying, this woman doesn't want me, doesn't like me because I'm old. And yet she picks her as the person to evaluate her. Well, who else could she pick? She could have picked a group of her own union members. That's what the mentoring, that was what the Fresh Start Agreement was about. You can either have the principal or you can have a group of the board and the teacher's union together. How many years has Ms. Jackson been involved in the Board of Education? I think she'd been involved since 1998. She'd been a teacher. She'd been a master teacher. She taught other teachers. And then she'd become a principal. This was her first job as a principal. Did you see any, well, I don't think it really matters. I don't know that the decision can be based on this. But as far as the mentor, the hearing officer was quite critical of her ability to mentor. Does that make any difference in this case? Well, I think what he was trying to do was impose the requirements of the former statute on evaluation into this new agreement. So he was asking, he was basically ignoring the party's agreement to have a new evaluation procedure. Under the old procedure, yes, you had to have the same subject matter knowledge as the teacher. But under this new agreement, you didn't. And the union agreed to this. The union agreed that Kelly was a great mentor. They picked her out of 90 mentors. She was one of 20. So I think that a lot of the hearing officer's discounting of Kelly was based upon Ms. Blumenthal. And if you look at the court's decision to reject her as an expert, that's reviewed by this court for an abuse of discretion. And that was not an abuse of discretion to reject her as an expert. What about the hearing officer's determination that Blumenthal was credible? Are we throwing that out? We're not saying that she wasn't telling the truth as she thought. We're not saying she wasn't credible. We're saying she wasn't expert because for three main reasons. One, she didn't have any credentials to evaluate teachers. She'd never evaluated a tenured teacher. Most importantly, she never observed Ms. Walchek during the year in question. She was never in her classroom. Did she review records involving the teacher? She said she skimmed them or scanned them. And yet she made all these criticisms that on cross-examination showed she didn't know what she was talking about. Is there something sort of naturally questionable about a teacher that has satisfactory ratings for 27 years and then all of a sudden someone else comes in, a new principal, and she's suddenly a horrible teacher who's not even able to be remediated? Remediated, I apologize. I'm having a tough time with that word. I mean, isn't there something sort of basically, I don't know, something about that sort of doesn't ring true to that? That this person had solid or satisfactory ratings for multiple years. She didn't really change the area of teaching, and yet all of a sudden she's suddenly not doing her job and she can't be remediated. Actually, two things. She did basically change her area of teaching because before she was more of a business teacher, and it wasn't until she moved to Wells that she started teaching English. Yes. She said this, actually, this year was the first she taught American literature. The second thing was she was rated satisfactory, but so were only 7% of Chicago teachers are rated satisfactory. Most of them were at this time rated excellent and superior. Yes. So already other principals saw, this one is in the bottom 7% of people teaching in the Chicago public schools. That was not just Jackson. Was she always just a satisfactory teacher then all those years? There was no superlatives about anything she did ever? I think that at one point in the 90s she might have been rated excellent, but from 1992 she was rated satisfactory. And her other principals noted that she didn't apply contemporary teaching methods, that she didn't do good classroom management. I mean, the Chicago public schools has a bad evaluation process. It's obvious from if everyone is making an A, it's not a good process. Well, let me ask you this. Is it a good process for someone who has been teaching within the last 25 years, who is not using the newer teaching methods? The world has changed dramatically. And for people that are not, let's say, technologically savvy, is it the kind of mentor that would be needed for them is not someone who is already born technologically savvy or has been involved with technology forever versus someone who actually knows how to mentor and transition a person who is not technologically savvy. I'm not sure that that's the way you can transform someone who didn't grow up in the computer generation. I'm talking about remediation. I don't know that someone who hasn't really taught, hasn't really been there, done that, but who's brilliant and is great technologically speaking, whether they can help remediate a person who needs to move into the next century. Because there are a lot of people out there that are in that other century, technologically speaking, but they're advanced in terms of everything else. Do you know what I'm saying? I understand. Let me say two things. Ms. Kelly was an expert at using technology, and she taught Ms. Walczak how to use email. She taught her how to access her lesson plans online. She also taught her how to use the lesson plans that were created by the textbook publisher. She taught her how to use those to put – I'm a dinosaur, too. You write it on here, and then you can see it on the board. She taught her how to use the audiovisual equipment. So she wasn't just saying, oh, you're a dinosaur, you don't know how to do this. She taught her how to do these things. My point was that I think that you may need a different kind of mentor to do that, to really make it work. But you might need also a person who's willing, and this person was not willing. Well, the hearing officer found just the opposite. He said she was willing, but she was placed in an untenable situation. So he made that finding a fact. And you're coming with an opposite finding, that she wasn't willing. He said she was. He saw her, saw her testify, and you're coming up with something opposite. How do we reconcile that with her? He didn't find her credible, Your Honor. He did not find her credible. He found her willing. He found her willing. And you're saying something different. In order to find her willing, he would have to have listened to her, heard her testimony, and he is making a credibility determination when he says that she was willing and able to learn. That had to be based on what her testimony was. So he is making a credibility determination there, isn't he? But he didn't find her credible on two really important issues, and that was one, that she says Jackson is saying she wants to get rid of her because she's old. And the second one is, at the last observation, Ms. Jackson testified that one student was listening to an electronic device and the other was asleep. When Ms. Walsh testified, oh, no, that person wasn't asleep. Well, the hearing officer found that person was asleep. So on those two issues, they found she wasn't credible. That's like mixing apples and oranges, if I may just say. When the hearing officer, Jordan, said, I don't believe that Jackson was racially biased or age biased against Walshick, he's not saying that Ms. Walshick isn't credible. He's saying that her subjective beliefs are not something he agrees with. No, Your Honor. Yes, he is. Because he's saying, I'm not going to say the principal was racially biased against her or that her bias was because of this woman's age. That doesn't mean that Ms. Walshick is not believable. It means he doesn't agree with her own subjective feelings. You know, we can say, oh, that person hates me because I'm this or that. I don't think it's a fair argument to say that because he said he didn't agree that Ms. Jackson wasn't racially motivated in her actions or that she was discriminating against her on the basis of her age, that suddenly Ms. Harriet Walshick is not a credible person. He's just saying he doesn't agree with her subjective beliefs about why the principal was out to get her. No, Your Honor. Okay. All right, you explain your position. Walshick testified that Jackson said, I want to get rid of you because you're old. I want you to retire because you're old. I encourage kids in your classroom to say that you're old. This is what Ms. Walshick testified. All right. The hearing officer said, and I quote, there's no credible or convincing evidence has been presented to suggest any action taken on the basis of race or age. Now, that's a completely different statement than what you just said. No, Your Honor. He said there's no credible evidence to what? To conclude that? No, has been produced to suggest any action taken on basis of race or age. Right, and he's basically saying I'm not going to sit here and say that she was discharged because of her race or her age. That's all he's saying. He's not saying she's incredible. He's saying I'm not going to conclude and state that the basis for all this was race or age. I think that's just a commentary that he doesn't want to turn this into. But anyway, that's sort of how I would read it. I understand your suggestion. I think that if he believed that statement, that would have been a basis for him to find bias. In regard to the evaluation process itself, what role did Kelly make in the decision by Jackson to discharge the claimant? She doesn't. Did she confer with the principal during this process? She said that she didn't. All right.  The agreement required that before she was to be discharged, there are to be three evaluations by the principal. One in the beginning, one in the middle, and one at the end. Right. Now this last one, there were only two students there. Right. And in the principal's own record, she said this setting was not appropriate to do a final evaluation. And there's nothing in the record to indicate that there was a subsequent evaluation made. So hasn't her rights been violated because you did not follow the agreement and conduct that final evaluation? She did conduct a final evaluation. There were two people present. But she said her own handwriting said it's not appropriate. I mean, the record she has in her own handwriting. This final evaluation I'm doing today is not appropriate to determine a discharge of a teacher. She conducted the evaluation. One person was a teacher. I mean, if I want to go with you on this case, how do I write around that? I think you have to write that during that final evaluation there were only two kids there. And the person conducting that evaluation says this setting is inappropriate to use to discharge Ms. Walczak. Yes. One way you could go about it is there was a note four days before that when Ms. Kelly had been in the classroom. Ms. Walczak was on one side of the classroom. But you said Kelly had no role in it. Her notes could have a role. But she did not influence Jackson. Jackson was supposed to make this determination on her own. And she goes in on the final evaluation, which is critical. In a situation where it's not appropriate to fire somebody, it just says you're gone. And it looks that it feeds into the theme that this is just another hurdle before we get rid of Walczak. Because she in her own handwriting says this is not an appropriate setting. Your rules require a final appropriate evaluation. And it was not done in this case. What would you do if you were the principal and you came in for the last evaluation? You would come in the next day and schedule one if that's really what you wanted to do to get a fair evaluation. If you wanted to see what Ms. Walczak could do, you said, well, this is not appropriate. Let me come another day. Wouldn't that be reasonable to say let me come another day when there is a more appropriate attendance in there and make an evaluation if that's what you wanted to do? I think if it were me and I came into a classroom and one child was sleeping and one was listening to an MP3 player and the teacher didn't do anything to stop that, no, I don't think I'd go back. I think after being a teacher for 30 years and getting 20 weeks of remediation, if you don't have the sense to wake up the student who's sleeping when your principal is there to evaluate you, you're probably not going to be remediated. Well, Walczak denied that that happened, didn't she? And the hearing officer found that she would – that that wasn't – the hearing officer believed Jackson because he criticized Jackson for not waking up the student. Well, was that a sarcastic remark? What principal wouldn't wake up a student? Is that kind of like a sarcastic – I mean, just think about it. If you were a principal and you're walking a student that's sleeping, what would you do? Would you continue to allow that? If I were the principal who was evaluating a teacher of 30 years standing, I would expect the teacher to handle it. But what would you do with regard to the student if you walked in the classroom? I would expect the teacher to handle that. Well, what about the principal? The principal was there to evaluate whether she's doing a good job. Yeah, I know, but I mean, she's still the principal, isn't she? Isn't she the one in charge of the whole thing altogether, really? Why shouldn't she wake up the student if the student was really asleep? Anyway, let me ask you this. Would you agree that under Hearn, that in this case, when they issued their determination to discharge Ms. Walchick, that they should have participated or allowed participation of the hearing officer because his credibility determinations suggest that termination was not appropriate? I don't believe he made clear credibility findings, as I've stated. Well, let's assume for purposes of argument that we think he made numerous credibility determinations in his 240-page report. If he had, I mean, I don't know how you could say he didn't make them, but let's assume just for the argument that he made them. Should the teacher be permitted to have a remand for the limited purpose of the board to allow participation by the hearing officer, Jordan, regarding his factual findings? No, I don't believe so, because basically his credibility findings were based upon Carlene Blumenthal's testimony. And the board, you reviewed the board's decision to reject an expert for an abuse of discretion. But even though it was based on Blumenthal, what we have is an opposite finding, and shouldn't there be some discussion that you're just out of hand dismissing it? Some of them arguably are not based on Blumenthal at all, and are based on his observation of the witnesses. And you went the total opposite. And at that point you took it upon yourselves to discount the hearing officer. I don't know why you would have hearing officers if you're going to do that in that case. Well, in this case the hearing officer wrote a lot, but he didn't write much about credibility. He found the only totally incredible witness was I.B., the student. The only totally incredible witness was I.B., the student. He found that Jackson and Kelly were not entirely credible, but he didn't say when they were credible and when they weren't. I suppose we could have him come and confer with the board, but I don't think it's necessary because I think the board's decision was well-reasoned and based upon the evidence that was in the record. And I think that the board had a very good reason for rejecting Blumenthal. And she was not an occurrence witness. She never saw Ms. Walchek teaching during the relevant period. So what relevance did her opinion really have, if not as an expert? How would you summarize the spirit of this statute that allows or requires credibility determinations to be made by the hearing officer, but the final determination of whether to accept or reject, or whether to terminate or not, rests with the board? I mean, there's something... The way this court says, the board isn't bound to defer to the findings of the hearing officer. It's only when it's based upon credibility determinations, and I don't believe the hearing officer here made clear credibility determinations. All right. So if we think that he made credibility determinations... All right. If those are clear, I don't believe they are. All right. Thank you. Okay. Thank you, Ms. Louder. Major, brief rebuttal here. Thank you very much. A couple points. One is I do disagree with a lot of the factual representations that counsel made on behalf of the board, and the record is clear on these issues. I'm not going to go through all of it, but I do want to say that there are so many findings by this hearing officer as to the credibility. He heard these witnesses. He heard extensively from Kelly and from Jackson. He found that Kelly was, as I said, only merely, barely paper qualified. She lacked fundamental life experience, no professional endorsements, no certifications to teach high school, and called her ill-equipped. He saw her. He heard her. But does he get to do that in this sort of setting? I mean, is that one of his jobs? Is he really saying she's not credible, or is he saying she's not qualified in my opinion? I mean, and does he really get to do that after she's already been appointed to be a mentor? Well, he's got to, you know, and that's an excellent question, Your Honor, because it's true that she was on this list. We don't know what the exact process was, but he's got to determine whether she carried out her function. And he found that she woefully failed. She didn't carry it out. One of the things when he heard her, when he saw her under cross, he saw her under direct, he made the determination that she was ill-equipped. She wasn't able to explain what she was doing. The testimony showed how disruptive she was in the class. She didn't know how to handle the issues. He saw and heard all that. And with regard to Jackson, he talked about her youth and lack of experience as being a parent. He specifically said she had a bias, appeared to have a bias against Wolchek. He called her mean-spirited, questioned her objectivity, said she lacked any sense of decency in some of the treatment she had toward Ms. Wolchek, called her disruptive, recognized that the special ed teacher that had been assigned for the special ed students was removed, special ed classes were put back to back without the kids having a chance to go out and exercise or have free time. There was the kids that were less challenging, as identified by the hearing officer himself, were removed, and the kids that were left, and he found that to be the facts. He also talked about the classroom she was put in for English, put in a science lab. I don't know that there's anything more these people could have done to sabotage any type of remediation efforts here. The hearing officer's finding was, and this is a quote, the remediation process was, quote, not fair, the environment was detrimental, the principal was biased and wrong, and the grievant was not allowed to remediate. What would you say in response to Justice House's question to Ms. Lauder about the failure in the last process where the third meeting was not procedurally proper because there were only two students present, and Ms. Jackson wrote that she felt that this wasn't valid in her own words? I think it's an absolutely excellent observation. Would that alone be sufficient to remand for? It was under Ruther. The Ruther case looked at when the school board failed to follow their own remediation procedural requirements, and that under the Ruther versus Hilliard case, which is cited in our briefs, that is part of the due process equation. They have to follow their own procedures. That's in a lot of Illinois cases that have addressed those issues. That's a failure of due process. And the statute, your honors, I really appreciate the effort that you're putting into this. It is a troublesome statute, but it's clear when you look at the language, and so many teachers are affected by this because when teachers are terminated, to know that you can have a hearing and put your evidence on, this was a seven-day hearing, put your evidence on, and then have the board just dismiss it and reject the credibility findings and the findings of fact. Just dismiss it like that. The statute is clear as to who makes the findings of fact, and it's important. I'm telling you, I have teachers call me all the time, and until this law is cleared up, it's a very dark day for teachers because they cannot get a real fair chance to address their termination. But you're requesting relief that simply says, well, we don't want any remand, we simply want her reinstated with back pay because this board won't appropriately consider the findings of fact of the hearing officer. Isn't that true? Yes. Well, a couple things. The evidence in the record is so supportive of this finding that there is, they can't look at this record and go otherwise. It just can't happen. But what we are asking for, we're asking for that relief, and that is the relief that I've seen in these cases. That's what the courts have done. They haven't made, this lawsuit's been out for years now. They haven't made that employee go back and try to go through this whole process again with the board that you can tell they have disdain. They're not going to do this. But that's one of what we're asking for. And we're also asking that the court look at this statute and clarify what the board's role, not just the Chicago court, but all the boards that review these hearing officers, and to address whether the hearing officer is the fact finder and whether the boards are or are not allowed to usurp. Don't you think Hearn says that? I think Hearn says that, Your Honor, but Hearn did not do an analysis of the statute. Hearn never looked at the language of the statute, and Hearn calls the findings of fact recommendations. That's not in the statute. Is it dicta? I'm not sure. It's just they summarily touched, breezed over the issue and then went into the general due process issues. All right. Okay? Anything further? That's all, Your Honor. I appreciate it. Thank you very much. All right. The case was well-argued and well-briefed by both sides, and we will take the matter under advisement. Thank you.